Ms. Blaine, good morning. May it please the court, my name is Lynn Blaine and I represent Dr. Sridhar Yaratha and Dr. Rebecca Bowder in this appeal from a decision from the Eastern District of Virginia. Subject to the panel's preference, my plan is to address the issues in the following order, the DBT issue, the injunctive relief, and then count four which is the conspiracy count. With regard to count one, this is a claim that Dr. Yaratha breached the professional judgment standard by failing to order a particular type of therapy for a patient at Central State Hospital. Such a decision is controlled by two different cases. One is the Youngberg case and the other is the Patent case which is out of this circuit. The Youngberg case states liability may be imposed on a doctor like Dr. Yaratha only when the decision by the professional is such a substantial departure from accepted professional judgment practice or standards as to demonstrate that the person responsible actually didn't base the decision on such a judgment. The Patent case goes on to say it is inappropriate for a court to determine the correct or most appropriate medical decision. The proper inquiry is whether the decision was so completely out of professional bounds as to make it explicable only as arbitrary. On that background then we look at the evidence in this case. First, the decision by Dr. Yaratha not to order the particular type of therapy in question is presumed valid. The plaintiff then has to rebut that presumption and he has to do it in two ways. First, in this case he had to produce a qualified expert witness to testify about the professional judgment of a psychiatrist. Second, he had to elicit testimony from that expert along the following lines. You ask the opinion and the doctor would have to say I have reviewed the medical records, the depositions, and in my opinion Dr. Yaratha's decision not to order this therapy had no basis in accepted professional judgment or was a sham or was a fraud. Neither of these two things happened in this case. First, Dr. McWilliams is a psychologist not a psychiatrist and therefore isn't in a position to criticize or comment on medical judgment exercised by a psychiatrist. Second, whether qualified or not there wasn't a single witness who testified as I said. I have looked at all the medical records. I have looked at the depositions and Dr. Yaratha's decision was not based on a professional medical judgment. This is after a bench trial and the district court cited all the same standards you are citing. It found that, and I hope I am summarizing this right, that there were three people, three psychologists, I guess one psychiatrist and two psychologists testified that DBT would be the only proper therapy here and that Dr. Yaratha disregarded that and he did that without consulting with any other expert in the area and that that was what sort of amounted to a failure to exercise professional judgment. So why is that wrong? So interesting because if you look at the testimony, there were three doctors. One is Dr. McWilliams. Here is what Dr. McWilliams said. I said, do you have any understanding as you sit here today why Dr. Yaratha and Dr. McGeachy decided that Mr. Faraby was not ready for DBT which is the therapy we are talking about? And he says, I can't fully disagree with why they did it because I don't understand why they did it. I am not fully privy to what they were thinking or doing. He hadn't seen the medical records. He hadn't seen the depositions where that was discussed. So his testimony is really without... Do we have a case in the First Circuit that says the only way to make a case under this standard is to have an expert say the words like this person failed to exercise any reasonable medical care? Well, in Patton, for example, the court said in response to testimony from an expert in that case who said failure to properly examine was a significant and gross deviation. That was the testimony from the witness and the Fourth Circuit found that was insufficient. You couldn't find it based on that. So I don't know in this case, then let me look at the other doctors. So then there is Dr. Torres who is a psychologist. And what Dr. Torres testified to was I offered DBT as a suggestion for the team's consideration. And if I had been the one to prescribe it, I would have wanted to know more. Because I feel a little bit like you are re-arguing the case like we are going to find the facts. And so maybe you can, this is probably the best way for me to ask this question. Where do you think the district court went wrong? The district court had a bench trial. It purported to apply the same standard you are telling us to apply. So what was the district court's error in this case? It did not have the opinion in front of it from a qualified expert that the decision not to order DBT lacked any professional judgment. So you are saying that is literally the only way that this burden can be met. There needs to be an expert saying this doctor failed to exercise professional judgment. You can't infer that from surrounding facts. What if Dr. Hirata had said I don't care at all what everybody thinks. I don't like this guy so I am not giving him the treatment. But nobody testified that that was a failure of medical judgment. Then the defendants win? That can't be right. We have never said that, that you can't infer the failure to bring to bear professional judgment from the surrounding circumstances. But there is a difference between what you have said and how you can infer from that statement and what the experts said in this case. I guess I am asking you again and then I promise I will let this go. Your answer to what the district court did wrong was that the district court found in favor of the defendant in the absence of expert testimony specifically and expressly saying that there had been a failure to exercise professional judgment. Is there any other mistake the district court made in your view? For example, if you look at the court's decision, one of the things that the court says in the patent case is, the court can't determine the correct or most appropriate medical decision. So if there are a range of options as there were in the patent case, it is not the court's job to say, well, I think that was the reasonable option or I think that is the only way professional judgment could be exercised. And that is what the court essentially did in this case because the language in the opinion is, the court said, I find DBT was an appropriate treatment. Not the only, not the exclusive, just an appropriate treatment. And he did it in the face of testimony from every medical professional that there is more that goes into the decision other than this man has borderline personality disorder, therefore he has to have DBT. And didn't the experts in this case essentially testify that these recommendations were just that, recommendations, suggestions, but not necessarily the be-all and end-all of treatment options? Every one of them did. Yes, sir. So I guess the fact that there might not have been an expert to testify as to the particular standard is entirely consistent with the notion that even these experts didn't suggest that this was required, absolutely required in the context of this case. Yes, and the judge in fact says to the contrary. He believed, the judge concluded, that these other doctors said DBT was required. That doesn't appear anywhere in the record and in fact their testimony was to the contrary, that it's the boots on the ground that have to decide what's best for this patient. So Judge Harris raised the question that I had, or she made a point about the record evidence in this case and I know you're taking these issues in order and of course the trial was a global trial that dealt with not just count one but count four where there was, the judge actually found that Dr. Urafa had an animus against Mr. Ferebee so much so that he conspired, I know you disagree with this, that he conspired with others to allow him to be assaulted and all manner of other things. So if the district court credited that evidence, why wouldn't that evidence be enough to rebut any notion of professional judgment with respect to the DBT treatment if in fact Dr. Urafa was simply hell bent on hurting Mr. Ferebee? I would point to two things. The first is Dr. McGachian who was also on the treatment team testified and she's a psychiatrist. She said we considered DBT, he wasn't ready for it and she testified at length why he wasn't. So it wasn't just in the hands of Dr. Urafa. The last piece of evidence that I would point the court to is exhibit 256. That's 105 page document that I submitted into evidence that shows biweekly or every month treatment team meetings among seven or eight professionals including psychologists, social workers, nurses and psychiatrists to talk about just Brian Ferebee and what he needed and then they would adjust the treatment plan based on that meeting. So it wasn't just a Dr. Urafa decision. He was in a team of people including psychologists. When I submitted that into evidence, the court said and specifically on page 956 said, do you really expect me to read that document? And I said, yeah, it's the treatment plan. It is what this doctor did to provide reasonable professional treatment to this patient. Ms. Blaine, I don't want to dictate to you how you want to make your argument, but I'm particularly interested in this count four issue because, again, for the reasons that Judge Harris pointed and the fact that we are not the triers of fact here, we have to be especially deferential to the judge in this case. But I will admit that I'm a bit by that finding particularly with respect to the fact that there appeared to be a lot of inconsistencies in the testimonies of these witnesses that the district court just simply didn't engage with. But ultimately he made a credibility finding against your client and in favor of Mr. Ferebee and Mr. Evans. So what are we supposed to do with that? Under the decision in Anderson, I looked at two different quotes from that decision. And it says, if the court reviews the entire evidence and is left with the definite and firm conviction that a mistake has been committed, then you may reverse factual findings by the lower court. Even if they're credibility findings? Well, then the next quote is, documents or objective evidence may contradict the witness's story or the story itself may be so internally inconsistent or implausible on its face that the fact finder would not credit it. That's what goes to the issue of a credibility finding. And I think the issue in this case is there are a number of areas where this court simply didn't include facts and didn't appear to look at facts which contradicted what the court ultimately wanted to find. First, you'll remember that the court said Mr. Ferebee behaved in an excellent manner at trial, but neglected to say that he was in leg and arm shackles and had two U.S. Marshals standing behind him. I think that's a significant point. Second, he found his testimony credible even though we demonstrated lie after lie after lie while he was on the stand. And the judge doesn't mention any of those lies in the context of his opinion in this case. To the district court's credit, he did suggest that standing alone, Mr. Ferebee's testimony would not be sufficient, in part because of the particular diagnoses that Mr. Ferebee had been found to be afflicted with, which would amplify notions of being, you know, health care providers being adverse to his interests and enhance interest in deceiving. But then he relied on the testimony of Mr. Evans, who suffered from the very same issues, which just seems to me to be difficult to reconcile. He never really explained why he did that. And I don't think he did either. And this is what is troubling to me in the record. And I'll give you another example. The judge, one of the issues that the judge was very concerned about was that on a particular day, Mr. Evans was transferred from Ward 4 back to Ward 8. Dr. Urratha wrote that order as the accepting doctor on Ward 8, but he didn't make the decision. And the judge was convinced that that was all part of this conspiracy and makes a statement, there is no corroborated evidence to support Dr. Urratha's claim that Evans was causing a problem on Ward 4. And I cited for the court, there are four different documents and testimony that corroborates Dr. Urratha's testimony. So why isn't that considered by the court? Were some of those reports written by Dr. Urratha? One was. But Mr. Evans, for example, who's supposed to be Mr. Farabee's corroborator, testified I was moved back to Ward 8 because when I got to Ward 4, I engaged in a campaign of self-harm that was pretty extreme. You don't want us to credit him, right? Because he also says that when I was moved back, Dr. Urratha told me to beat this guy up. So, surely you're not relying on him. Well, here's the problem. Who do we rely on in this case? If you look at Mr. Farabee, he's a liar. There's no question. I know you're lights on. Can I just ask you a very quick question? And it goes back to something Judge Diaz said, which is that the judge has to take this case as a whole. And I know that you're not, no one's appealing on count three. But count three, apparently some nurse just falsifies a document against Mr. Farabee and gets him into disciplinary trouble, makes up a story about him. No one's even appealing there. The district court's finding that that was just a false report. I mean, there's something very weird going on here, right? Well, with regard to that incident, everybody agrees. And Dr. Urratha was called to the scene, looked at the video, and said, you didn't kick him. Now, if you believe this grand conspiracy, there's a lot that he could have done to get Mr. Farabee into trouble. The district court said that Dr. Urratha did, though, cite the alleged kicking of the nurse as a reason to continue his confinement in two annual reports submitted in October 2014. Is that incorrect? No. Here's what I want you to look at, if you have a minute, on Joint Appendix 1259. That report is a 20-page report, which was developed 11 months after the incident. The report about the kicking is maybe 10 words of a 20-page document. It was not the basis for him continuing to be confined. But, Dr. But he did make a mistake. And he said, I did. But it was not the basis for, and the other, I'll make one more point, and then I'll sit down. In that same document, Dr. Urratha said, we want him to behave for 30 days because we then want to move him to a doctor. Dr. Urratha put in papers for Mr. Farabee to move to a civil hospital, which is what Mr. Farabee wanted. If there was some grand conspiracy to punish Mr. Farabee, Dr. Urratha wouldn't have done that. He would have kept him there so he could punish him as the plaintiff contends he did. Thank you. Thank you. Mr. Denton. Thank you, Your Honor. May it please the Court. Jeremiah Denton for Brian Farabee, the appellee cross-appellant. Really, there are two primary issues in this case. One is, did Judge Morgan clearly, was he clearly erroneous in finding that the decision to deny DBT was not a product of professional judgment? And the other question is, was he clearly erroneous in finding, in failure to provide a safe environment for Mr. Farabee, as addressed in count four, was not a product of professional environment? Now, the clearly erroneous standard of review Sorry to hijack you at the beginning, but we haven't talked about the injunction, and I was wondering about whether Dr., is it Vauder, the director, was she sued in her official capacity? It didn't look like it to me, but I can let them know. Personal. Just personal capacity? I believe that's correct. Okay. And where is Mr. Farabee now? He is now at the Marion Prison. Okay. Was there any evidence of the likelihood that he would be returned to Central State? Yes, Your Honor. What's that? He's due, well, he is due to be released from the prison in April of 2022, and he will be recommitted to the Department of Human Services, to the mental health system, and we do not know specifically which hospital he'll go to. We do not know specifically that he'll go to Dr. Vauder, or to a hospital under Dr. Vauder direction. So why is the injunction not moot? Your Honor, the, well, let me get to my notes on that point. It's not moot because he suffered three years of the deprivation of the care that he was supposed to receive by not receiving DBT. The standard, Your Honor, for an injunction from Simmons v. Poore is that there has to be, before an injunction can issue, there has to be a real and imminent threat of a continuing harm. Well, I think that it's clear that there is a real threat because he experienced three years of no DBT already. Dr. Vauder, I don't think I have a strong case that it's imminent. I will just suggest this, though, and that is that Mr. Fairby does not live the life like a normal person. He's in solitary confinement in a prison. The next time anything happens to him that will be different in any qualitative way in his life is the day that he's released, which will be the day that he is recommitted. But it's possible that the injunction wouldn't help him, right? If Dr. Vauder moves to a different hospital and it's in her, she's personally enjoined, not in her official capacity. If she moves and someone else is the director of the hospital, they wouldn't be enjoined. Correct, Your Honor. I agree with that. All right. Thank you. I think throughout any consideration of this case, the court needs to be very aware that Youngberg on page 321 and Patton on page 844 each said that the district court's job in these cases, the district court is, quote, required, close quote, to, quote, make certain, close quote, that professional judgment was The reverse happened here. The judge made certain that professional judgment was not used. And there is a wealth of evidence, Your Honor, substantiating the court's findings both on the denial of DBT under count one and on the denial of a safe environment. Not a conspiracy. Denial of a safe environment. That's the constitutional standard under Youngberg v. Patton. All right. And as far as, just to skip very briefly because, Judge Day, as you raised the question about taking the word of the mentally ill, this court in U.S.V. Hall 664-3 did find a mentally ill patient credible. And I don't think the court ever wants to take the position that just because somebody's been diagnosed with something under the DSM-5 that their credibility is per se discounted. And I don't mean to suggest that, but I think you would agree that it is something to be considered. Absolutely. And it is very clear from Judge Morgan's work that he did consider that. And he, in fact, handicapped. And I don't think there's anything in the law, I'm not saying it's beyond the discretion, but there was nothing in the law that required or even authorized explicitly that I know of, of a handicapping of a witness's credibility simply because they have some sort of a diagnosis. Well, since you turned to that, let me ask you about it. Because, again, we've come to this, I think all of us, with the understanding that we were not the triers of the fact. We weren't there. We didn't, Judge Morgan saw the witnesses, except for one, Mr. Evans, who was deposed. I don't know that. He saw the video. Well, we could see the video as well. So I don't know that we're in any worse position than he is to see that. But he did see the witnesses live, Dr. Evans and others. So we have to give substantial credence to what he determined to be the credibility issues. But my problem with this case is that there are a number of inconsistencies in the record on both sides that Judge Morgan just simply didn't engage with. Let me finish. Both that went to the substance of the allegations that were made and some that were admittedly collateral. For example, Mr. Farabi's testimony, denials of stuff that was in his medical records. Let me just give you a glaring example of one point that I don't think Judge Morgan engaged with. And that is when Mr. Evans was first asked by investigators whether or not anyone else had enticed or encouraged him to attack Mr. Farabi, he denied it. And Judge Morgan says nothing about that. And there are a whole host of other such issues that your colleague, Ms. Blaine, identifies in the record as things that you would think a district court would at least give a nod to in deciding whether or not a particular witness is credible. So tell me why that isn't a problem. Okay, Your Honor. Thank you. With that particular example? Well, just generally. No, no, no. I want to address that. Sure. With that particular one, it would be Mr. Evans acknowledged, and it was the guiding principle of his testimony, that he was doing Dr. Urratha's bidding by hurting this patient. Do you think that he is going to admit that to an investigator? It would be natural for him to deny that. He's not going to get Dr. Urratha, who he knows has the capacity to sadistically torture a patient. He is not going to be anxious to do anything that's going to get Dr. Urratha in trouble. As to the other, and I read the report, it changed. What changed? Some years went by. I went over and interviewed the guy in the hospital, and I said, you need to tell the truth, and he did. And we took his deposition there in the hospital. That's what changed. Okay. Well, that's, you know, that's a, I suppose, a plausible explanation, but that's not an explanation which Judge Morgan provided. He didn't, Your Honor, but I think you're getting into his function as to weigh in the evidence, and, of course, he doesn't have to, in his findings, in fact, draw up a ledger. He doesn't have to dot every I, cross every T, but I just thought that his general credibility findings were just that, very general. Well, Your Honor, I hope the court has occasion to actually view that video, because Mr. Evans came across quite, quite credibly, and as the court pointed out, Mr. Evans and As to the other inconsistencies, there was a litany of them listed by defense counsel in their brief, but, Your Honor, they were largely peripheral matters. There was no, you know, like, was it the left hand or the right hand kind of stuff. There was nothing where there was a fundamental disagreement between Dr. Farabee, I mean, Mr. Farabee and Mr. Evans on anything. They were very, very consistent, Your Honor. Well, I don't know about that. I mean, there was some testimony in the record about Farabee identifying several doctors as being involved in this plan to hurt him and Evans being inconsistent in terms of who was exactly involved, those kinds of things. There was one. That's not collateral. Those are things directly. That's true, but that was one. Farabee, I think, said Wolfe, Dr. Wolfe had done something to him, and Evans said, oh, no, that was But again, Your Honor, you're talking about something that happened three years ago. There's a swirl of activities going on in that hospital at all times. You can tell from the various videotapes you've seen, and so you can't expect these two witnesses' testimony to be letter for letter mirror image of each other. So I think I've addressed that as well as I can, Your Honor. The court found, as a matter of fact, that Dr. Uretha's testimony was inconsistent and conflicted in important respects, that it was really Farabee's bad behavior that caused Dr. Uretha not to give him the DBT that is the treatment for this disease. Not that something else might not help, but you've got to have this, according to Dr. Williams, if you're going to get cured of borderline personality. Dr. Uretha, Your Honor, himself said twice in the transcript, and I've got a bunch of pages on that, 1207, 1031. You'll see Dr. Uretha saying, I didn't give him DBT because of his bad behavior. Testify to that, Dr. Uretha did, and testify that in order to So the court quoted that saying the patient may not be able to address the past stressors like he would have to do with DBT if he can't handle current stressors. So the doctor was talking about currently when something stressful happens in his life, he acts out. It's a lot to presume he's going to be able to handle thinking about all the stressful things in his past. As I've read it, that's what the court was citing when the court said that the doctor was talking about bad behavior. Current bad reactions to stressors, which the doctor in his medical judgment thought if he can't handle these current stressors, we're not going to be able to move on to DBT. That was the context in which Dr. Uretha gave that testimony. Dr. McWilliams, however, testified that bad behavior and those stressors are exactly the reason that somebody with borderline personality disorder needs the DBT. Well, that sounds to me like a dispute well within the realm of medical judgment. It is. But the court found that he did not make the decision based on medical judgment. He made it because of what he referred to as the animus that Dr. Uretha had for the patient. I think the court made a very good point. Did the court say that? I thought when it came to count one, as you say in page nine of your brief, that the court noted Dr. Uretha said the benefits didn't outweigh the risks of DBT right now, couldn't handle past current stressors so he won't be able to handle past stressors, and the court credited Dr. McWilliams who said really DBT is the best thing for him and that's what he should have had. I didn't see the court saying Dr. Uretha knew DBT was the right thing but denied it because of animus. He said, the court's order says that Dr. Uretha denied DBT because of the plaintiff's exceedingly bad behavior. Right, which is what we talked about just a moment ago, right? The reactions to current stressors. I suppose you could infuse several meanings into that but the meaning I infused into it was that you read that in light of what was going on in count four or the campaign to terrorize therapy using another patient. Our standard here is it's a sham. It's not professional judgment. Any suggestion that professional judgment was exercised is a sham. We have these medical records, hundreds of pages of meetings between doctors talking about his treatment, trying to decide what's best for him. It's a lot to say that that's a sham and that's what we have to be able to say. Well that's what the district court had to be able to say and what this court does is has to find out if there was any evidence that supported that. Counsel, can I ask you, I also didn't see any reference under count one to sort of animus. But I thought the district court was relying very heavily on the idea that look, there are these three recommendations that he should have it. There's no one saying he shouldn't have it and he didn't consult. He didn't, Dr. Uretha didn't find someone with expertise in DBT to say he shouldn't have it. That it was the failure to, given these three consistent recommendations, to even see if he could find someone with expertise in this to say otherwise. That that was, is that enough to say that you're not exercising professional judgment? That you don't, you kind of reject the recommendations in front of you and you don't do more research? Your Honor, DBT requires a lot of effort. You've got to have a doctor who sits there with a patient and gets, it's couch therapy. You've got to have a doctor who takes the time to sit there and give that. There is a question here about do they even want to do that? Now Dr. McWilliams I believe testified that you know it's a lot of trouble to do DBT. He's, Dr. McWilliams actually predicted almost 20 years earlier that he's not going to get DBT in the state system. It, because they won't, it's too much trouble. They won't, they won't provide it there. He predicted that. If you go back to that exhibit. I think the question was is a, is failure to further research or follow up, is that enough to be, to show that there wasn't medical judgment exercise? And I'd be interested in your answer to that in light of the patent case. That in and of itself, no Your Honor, I don't think so. But the complete ignoring of the qualified witnesses, the psychologists saying he needs, and by the way I think this is very important and the judge didn't focus on it. There was a recommitment hearing before he went to Central State Hospital in the circuit court about should he be recommitted to the Department of Mental Health. Dr. Torres, the same psychologist who gave this recommendation of DBT, appeared at that court hearing, testified at that court hearing in Williamsburg to the circuit court, said yes, he needs to be recommitted to get DBT. That's what she said. Now that's what they exhibit in the case. And so he was essentially sent there to get this. He didn't get it. And what he did get was the involuntary shots, which I have not talked about. And I'd like to just make a brief comment or two on that. I cross appeal. The legal issue there is it's clear that a patient can say I don't want to be receiving these medications and he doesn't get them unless there is an emergency. Then his will can be overridden and he can be forced to take the medications. Dr. Urata said, well, there was an emergency. He gave almost no backup for that, but he said there were emergencies that justified these shots. The court said the plaintiff had the burden of proof to prove that there was not an emergency, and I think this court has ruled otherwise. And I cited in my first brief, I hadn't found this case, and I said the only case we got is an Arizona case or whatever. But in my reply brief, I cited Johnson v. Coteau, 1991, U.S. Appalachia, 1485. Again, there was an emergency. The shots were given. The court there, the district court there had dismissed, if I could continue. I'll let you go on because you've got this cross appeal. Try to be brief. Thank you, Your Honor. The court there had dismissed the complaint as frivolous. The Fourth Circuit reversed because they say this raises a question of the only way that these shots could have been justified was to prove that there was an emergency. And the court said that was an affirmative defense of qualified immunity and sent the case back to the district court. So on the basis of that Johnson v. Coteau case and also a district court case out of Maryland, Your Honor, BLV, and I can't pronounce the last name, but it's in 369F sub 3rd 642, the court made the point on the same circumstances, defendant has made the requisite showing of an emergency, suggesting that the burden was on the defendant to show that there was an emergency, not on the plaintiff to prove the negative that there wasn't. So I think the judge erred on the allocation of the burden of proof there. Thank you very much. Thank you, Mr. Dunn. Thank you, Your Honor. Briefly on the cross appeal, if the court refers to Joint Appendix page 1853 and continuing, we put into evidence a summary and then all the backing documents for that summary to show when the forced medication incidences occurred and what the emergency was at that time. So we met whatever burden of proof we had, number one. And number two, the cases cited by the plaintiff deal with the claim of qualified immunity. And on a claim of qualified immunity, the person asserting the immunity has the burden of proof. In this case, we were at a bench trial where they're trying to prove that the giving of forced medication was not an emergency, and they simply didn't prove it. And we proved to the contrary. So I think that issue is taken care of. I just want to mention a couple things with regard to Count 4. My colleague suggested that there was nothing about which there was a fundamental disagreement with regard to the events surrounding the interaction between Mr. Evans and Mr. Farabee, and I couldn't disagree more with that. If you look, for example, at a number of times Mr. Farabee made complaints about staff members attacking him, and we're talking about four particular attacks, the ones we're talking about. And on a number of occasions, he filed complaints alleging that other staff members were the ones who prompted Mr. Evans and gave Mr. Evans the contraband, and that's why Mr. Evans attacked him. And that is in itself an internally inconsistent problem, in addition to the issues of Evans' version of events versus Mr. Farabee's version of events. The court required corroboration because of the issues with truthfulness on the part of both Mr. Evans and Mr. Farabee. And if you look at the essential pieces of the case, they were not corroborated. One, Mr. Farabee said, I overheard Dr. Urratha say, I'm really sorry I can't help you mess up Mr. Farabee more, to Mr. Evans. Mr. Evans said, he never said that to me. And any time I talked to him, we were in a position where you couldn't hear it. So neither of them corroborated the other in the material respects that needed to be corroborated for this case to be successful for the plaintiff on count four. One of the points that, Judge Harris, that you brought up was when would you not need expert testimony? If you apply the professional judgment standard to the claim in count four, and that is that Dr. Urratha conspired to beat people up, I don't think you need an expert on that point. I think that is outside the bounds of professional judgment, and expert is not required. But when there are a number of professionals saying two different things and explaining why, that's when you need an expert. So that expert gives an opinion, and I'm able to cross-examine on why you think that's a breach of the professional judgment. So if we were to credit the evidence in count four, does that essentially doom your argument in count one? No, because they're completely different issues. Are they really? I mean, this is one trial. No, I understand, but the claims are completely different. One is an issue of DBT, why that wasn't given. But you just told us that if, in fact, there was evidence to support the notion that Dr. Urratha and others conspired to harm Mr. Farabi, that you would need any expert evidence on that point. On count four, I think that's exactly right. Yeah, but why doesn't that bleed over into count one? Well, because the issues in count one, as Judge Rushing pointed out, are not those kinds of issues. The issues there are one doctor looked at a situation and said, I think it would be bad for him, and here's why. But as a subjective matter, we thought that Dr. Urratha, whatever anyone was going to tell him, just didn't like this guy. I mean, surely that would have a bearing on count one, too, right? I mean, how could that not? And also, I will say, it is always difficult in reviewing a district court in this posture, and it's a little hard for me to understand exactly what the district court was most focused on on count one, but there is a sense that, look, he just didn't like this guy. He kept acting out, and that was the only reason he gave for not giving him the treatment, that he acts out, he's a discipline problem, bad behavior. There's a bit of a flavor that, you know, maybe Urratha just didn't like him and that the district court was paying attention to that, even under count one. My belief is that the district court wasn't happy with the treatment that Mr. Fairby had gotten for 20 years in the system, and I think he saw this case as a way to make up for the problems with his treatment, and I think that's why he focused on it. Understand, if you're at Central State Hospital in the maximum security unit, this is how you behave. This is not out of the ordinary. Dr. Urratha and Dr. McGakin said, we deal with this every day all the time. So that being the reason for animus, the bad behavior, makes no sense in the context of that hospital. Thank you so much. Thank you, Ms. Quain. So, Den, do you have a brief rebuttal on your cross opinion? I think when we get down to the point where we have to try to read Judge Morgan's mind, I mean, that's the reason why this court refers to the judge's factual findings. When I referred to animus in count one, that's what I was talking about, was the let over from count two. No, there's nothing in the discussion of count one for the testimony in count one itself, really in count one that emphasizes that. I do want to address, though, this issue of the weight of the evidence here, which is really what we're talking about on count four. Farabee testified that you're out there. I'm not sure that you're entitled to a rebuttal on that point. Oh, I'm sorry. You're entitled to a rebuttal on your affirmative claim on the cross opinion. If you have nothing further to say about that, then I think we're done. I have nothing further to say about that, Your Honor. I think the burden of proof is the only issue there, and I cited the authorities. Thank you. Thank you very much. All right. We're going to come down and recounsel, then take a brief recess. This honorable court will take a brief recess.
judges: Albert Diaz, Pamela A. Harris, Allison J. Rushing